UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
:
SHMUEL STOLLMAN *et al.*,                                     :
                                                              :
                              Plaintiffs,                     :
                                                              :                    20 Civ. 8937 (JPC) (JW)
             -v-                                              :
                                                              :                    OPINION AND ORDER
                                                              :
LAKEASHA WILLIAMS *et al.*,                                   :
                                                              :
                              Defendants.                     :
                                                              :
--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      On October 27, 2017, employees at PS 77K, a New York City public school serving

primarily students with special education needs, made the difficult decision to report the suspected

maltreatment of a then fourteen-year-old girl, referred to herein as E.S., a mostly nonverbal student

who suffers from autism and other disabilities.  This report prompted an investigation by the New

York City Administration for Children's Services ("ACS"), which soon after brought a petition

pursuant to Article 10 of the New York Family Court Act, N.Y. Fam. Ct. Act §§ 1011 *et seq*.,

against E.S.'s father, Shmuel Stollman, alleging sexual abuse of E.S. and derivative neglect of her

younger brother, L.S.  In July 2018, at the conclusion of its investigation, ACS withdrew its

charges, and the state action was dismissed without prejudice.

      Shmuel Stollman and his wife, Elisa Stollman, (together, "Plaintiffs")—individually and

on behalf of E.S. and L.S.—have brought this action under 42 U.S.C. § 1983 against the City of

New York (the "City") and individual City employees, alleging that Defendants' actions in the

child abuse investigation and resulting family court proceedings against Shmuel Stollman violated

Plaintiffs' civil rights under the First, Fourth, and Fourteenth Amendments to the United States

Constitution, as well as under New York law.  Before the Court are Plaintiffs' motion for partial summary judgment on their Fourth Amendment unlawful search claim and Defendants' motion for summary judgment on all of Plaintiffs' claims.  For the reasons discussed below, the Court denies Plaintiffs' motion and grants Defendants' motion, dismissing with prejudice Plaintiffs' federal claims and dismissing without prejudice their state claims, over which the Court declines to exercise supplemental jurisdiction.

## I.  Background

### A.    Facts[1]

In 2016 and 2017, E.S. (then thirteen to fourteen years old) attended PS 77K, a New York City Department of Education ("DOE") school, where she received services for her special

---

[1] These facts are mainly drawn from Plaintiffs' statement of undisputed material facts, filed pursuant to Local Civil Rule 56.1(a) in support of their motion for partial summary judgment, Dkt. 129 ("Pls. 56.1 Stmt."); Defendants' statement of undisputed material facts, filed under Rule 56.1(a) in support of their motion for summary judgment, Dkt. 136 ("Defts. 56.1 Stmt."); Defendants' response to Plaintiffs' statement of undisputed material facts, filed pursuant to Rule 56.1(b) in opposition to Plaintiffs' motion for partial summary judgment, Dkt. 146 ("Defts. Counter 56.1 Stmt."); Plaintiffs' response to Defendants' statement of undisputed material facts and counter-statement of additional material facts, filed pursuant to Rule 56.1(b) in opposition to Defendants' motion for summary judgment, Dkt. 143 ("Pls. Counter 56.1 Stmt."); Defendants' reply to Plaintiffs' response and counter-statement, Dkt. 154 ("Defts. Reply 56.1 Stmt."); and the exhibits filed by the parties.  Unless otherwise noted, the Court cites only to Plaintiffs' or Defendants' statement of undisputed facts or Plaintiffs' counter-statement of additional material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add its own "spin" on the fact or otherwise dispute the inferences drawn from it.

Defendants urged the Court to disregard the 489 additional statements included in Plaintiffs' Rule 56.1 counter-statement as contravening Rule 56.1(b)'s allowance for a counter-statement to include "additional paragraphs containing a separate, *short and concise* statement of additional material facts to which it is contended that there exists a genuine issue to be tried," S.D.N.Y. Loc. Civ. R. 56.1(b) (emphasis added).  *See* Dkt. 155 ("Defts. SJ Reply") at 2-4.  While Plaintiffs' Rule 56.1 counter-statement certainly stretches the bounds of Rule 56.1(b), particularly given that many of the issues purported by Plaintiffs to be in dispute are immaterial to resolution of the parties' motions, the Court declines to strike it based on the sheer number of statements contained therein.  But to the extent these statements—or any statements submitted by either

education needs.  Defts. 56.1 Stmt. ¶¶ 5, 6.  E.S., who suffers from autism, cognitive impairment, and various other disabilities, is mostly nonverbal and unable to care for herself.  *Id.* ¶ 5; Pls. Counter 56.1 Stmt. ¶ 81.  For instance, in 2017, E.S. wore a diaper and required an adult's assistance to use the bathroom.  Pls. Counter 56.1 Stmt. ¶¶ 86-87.  She sometimes had accidents at school, with urine spilling out of her diaper and wetting her clothes.  *Id.*  ¶ 88.  Moreover, with a mental age of roughly two years old at that time, E.S. could say only a few basic words.  *Id.* ¶¶ 82-83.

As a result, E.S.'s teachers and service providers tried to communicate with E.S. through her DOE-issued electronic tablet, an iPad containing approximately 500 words that E.S. could select.  Defts. 56.1 Stmt. ¶ 7; Dkt. 133-7 ("Shmuel Stollman Dep. Tr.") at 24:8-25:15.  As might be expected, it was difficult to determine precisely to what extent E.S. could use that iPad to express herself.  Mr. Stollman testified that he used the iPad to communicate with E.S., but he could not recall whether E.S. was herself able to navigate the iPad or communicate even simple ideas through it.  Shmuel Stollman Dep. Tr. at 24:8-25:10.  Edward O'Connor, a school psychologist who worked extensively with E.S., noted that E.S. pressed "Snack" or "Lunch" on the device when she was hungry.  Pls. Counter 56.1 Stmt. ¶ 203; Dkt. 149-20 ("Dec. 15, 2017 Fam. Ct. Hr'g. Tr.") at 54:3-6 (O'Connor testifying).  He further observed that, when prompted with a question, E.S.'s answers were sometimes responsive.  Pls. Counter 56.1 Stmt.  ¶ 205; Dec. 15, 2017 Fam. Hr'g. Tr. at 63:5-17 ("Q:  During your sessions with [E.S.] do you think she uses her [iP]ad with communicative intent?  A:  At times.").  Tonya Wheelock, E.S.'s one-on-one

---

party—contain improper legal conclusions, lack citation to admissible or relevant evidence, or lack relevance themselves, the Court disregards them herein.  *See, e.g.*, *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("The Court has disregarded any inappropriate portions of Plaintiffs' [Rule 56.1] submissions, and its analysis relies upon admissible evidence.").

classroom paraprofessional, found that E.S. "used the iPad to express her needs and her wants," noting that E.S. "knew the iPad better than [Wheelock] did, [E.S.] knew how to bring up the keypad on the screen, and she would type in stuff."  Dkt. 150-3 ("Wheelock Dep. Tr.") at 46:12-18.

In December 2016, a PS 77K employee, concerned with E.S.'s hygiene and presentation at school, reported suspected neglect or abuse of E.S. to the New York State Central Register ("SCR").  Defts. 56.1 Stmt. ¶¶ 8-9; Pls. Counter 56.1 Stmt. ¶¶ 8-9; Shmuel Stollman Dep. Tr. at 14:15-15:19; Dkt. 133-8 ("Elisa Stollman Dep. Tr.") at 9:9-13:8.  The report was transmitted to ACS, and the case was assigned to a Family Assessment Response ("FAR") caseworker.  Pls. Counter 56.1 Stmt. ¶ 10; *see also* Dkt. 133-2 ("FAR Investigation Notes").  From December 2016 to February 2017, the caseworker gathered information from E.S.'s teachers and service and care providers, routinely visited Plaintiffs' residence, and ultimately concluded that Plaintiffs had been providing both children with a safe and stable household and consistent, appropriate supervision. Defts. 56.1 Stmt. ¶¶ 13-14; Pls. Counter 56.1 Stmt. ¶¶ 13-14.

Meanwhile, Ms. Stollman had her own concerns about the school's support and supervision of E.S., which she voiced throughout 2017.  Pls. Counter 56.1 Stmt. ¶¶ 142-146.  For instance, she noted in E.S.'s "communication book" (a notebook that E.S. carried to and from school, thus allowing E.S.'s teachers, service providers, and parents to exchange comments) that E.S. had come home, on one occasion, with bruises on her arm and, on another occasion, with broken glasses. Elisa Stollman Dep. Tr. at 13:19-14:6.   Across several meetings with Wheelock, Carmela Montanile (PS 77K Assistant Principal), and Ebony Russell (PS 77K Principal), Ms. Stollman complained that E.S. had returned home with a rip in her skirt and with a wet diaper and wet clothing.  Wheelock Dep. Tr. at 99:23-104:8.  In October 2017, Ms. Stollman called the school to ask whether E.S. "was upset in school, if she was crying, because she arrived home upset and

crying." Dkt. 149-19 ("Dec. 14, 2017 Fam. Ct. Hr'g Tr.") at 48:19-49:8 (school psychologist

Annemarie Fuschetti testifying about a voicemail Ms. Stollman left on October 26, 2017); *see also*

Elisa Stollman Dep. Tr. at 43:16-44:10 ("I wasn't happy with the school because [E.S.] was

coming home crying and I didn't know what was going on."); Pls. Counter 56.1 Stmt. ¶¶ 149-150.

Around the same time, Wheelock observed that E.S. had been selecting the icon for "butt"

on her iPad with increasing frequency. Wheelock Dep. Tr. at 141:8-142:7. On or around October

19, 2017, she noticed that E.S. was also making references to "sleeping with men, men, men or

man or kissing and she used the word hug sometimes." *Id.* at 142:3-7. Wheelock shared her

observations with O'Connor and another school psychologist, Annemarie Fuschetti. Dec. 14, 2017

Fam. Ct. Hr'g Tr. at 47:20-48:7 (Fuschetti testifying that Wheelock reported E.S.'s use of the

words "man, bed sleep, pillow"). Fuschetti also learned around this time that E.S. was coming to

school unbathed and with soiled clothing. Dkt. 150-12 ("Fuschetti Dep. Tr.") at 40:25-41:9.

On the morning of Friday, October 27, 2017, Assistant Principal Montanile further

informed Fuschetti that Ms. Stollman called the school because E.S. had been "arriv[ing] home

from the bus upset and crying." Dec. 14, 2017 Fam. Ct. Hr'g Tr. at 48:8-16. That same day,

Wheelock brought E.S.'s iPad to Fuschetti's office, reporting that E.S. had once again selected a

concerning group of words—this time, "[w]ords such as man, finger, butt, bed." *Id.* at 52:1-8.

Fuschetti thus conferred with Assistant Principal Montanile, Principal Russell, and O'Connor, *id.*

at 52:9-21, and the school thereafter reported the suspected maltreatment of E.S. to SCR, where

an employee generated an intake report summarizing the "inadequate guardianship" allegations as

follows:

> Around 2-3 times per month, the parents fail to bathe [E.S.] and provider [sic] her
> with adequate clothing as [E.S.]: emits a foul odor, has soiled underwear caked
> with feces from the previous night, and clothing which is soiled and unkempt. The
> parents have a history of failing to adequately care for [E.S.'s] hygiene . . . . Source

reported the hygiene concern in the past as it was a daily concern.  The parents are still failing to adequately care for [E.S.'s] hygiene.  [E.S.] uses an [iP]ad with an application she uses to communicate with as she is non-verbal.  [E.S.] has been using the [iP]ad to communicate since she was in elementary school per source.  Since 10/19/2017, [E.S.] has been communicating concerning statements including "man, finger, butt" and "kiss man" and "sick men" which is out of character per source.  [E.S.] is unable to give context or details regarding these concerning statements.  Unknown what specifically is occurring and who is responsible.  The mother called the school today 10/27/2017 and stated [E.S.] has been crying the last four days upon returning home from school which concerns the mother.  Staff stated [E.S.] leaves and is transported home seeming happy.

Dkt. 130-7 ("SCR Report") at 4; Pls. 56.1 Stmt. ¶¶ 5, 6, 9.

Soon after calling SCR, the school prepared a written report of the allegations (Form LDSS-2221A).  *See* Fuschetti Dep. Tr. at 97:4-7 (confirming that "whoever makes the report to the SCR has to file the 2221A form as soon as possible after the call").  That form included additional information on E.S.'s iPad use, and reflected that E.S. had selected the terms that raised concerns (*i.e.*, "kiss," "men," "sleeping," "butt," and "finger") at the same time that she selected more mundane terms (*e.g.*, "cart, "doghouse," "watch," and "seatbelt"):

> On 10/19/2017 [E.S.] was working with [source] when she wrote, "A sleeping bag men lie to own power fat boy men."  When asked where she sleeps, she answered on her communication device which she has had for many years, "Pillow."  When asked with who she said, "Thick more men."  When asked are you in bed by yourself, she answered, "Kiss men shoe sometime exact."  On 10/27/17 at 11:09am, she wrote on her device while in the classroom, "Room men room town shopping cart doghouse watch seatbelt finger man lunch they are going history thunder man finger butt many tired."  Staff in the classroom report that statements about sleeping and men have been common for the last two school weeks.

Dkt. 133-3 ("Form 2221A") at 3.

Upon receiving the SCR intake report, ACS opened an investigation and assigned the case to Miriam Ortiz-Downes ("Ortiz"), a Child Protective Services caseworker.  Defts. 56.1 Stmt. ¶ 20; *see also id.* ¶ 4 ("New York State Laws also mandate that upon receipt of a report of child abuse or maltreatment, ACS initiate, within 24 hours, 'an appropriate investigation . . . .'" (quoting N.Y.

Soc. Servs. L. § 424(6)(a))).  It is not clear whether, and if so when, ACS received the separate written report (the Form 2221A) prepared by the school.  Pls. Counter 56.1 Stmt. ¶ 15; *see* Dkt. 150-1 ("Ortiz Dep. Tr.") at 230:18-231:9; Dkt. 150-8 ("Williams Dep. Tr.") at 116:19-117:25.

That evening, Ortiz made an unannounced visit to Plaintiffs' residence, where she interviewed Shmuel and Elisa Stollman, as well as their son, L.S. (then eight years old), and observed E.S.'s interactions with her parents—particularly with her father.  Pls. Counter 56.1 Stmt. ¶¶ 22-23.  During that visit, Ortiz kept a contemporaneous written record of what she saw and heard, and later copied her notes into an electronic database.  Ortiz Dep. Tr. at 37:22-39:5; *see generally* Dkt. 133-5 ("ACS Investigation Notes").  Ortiz learned that Mr. Stollman would return home from work late at night, bathe E.S. "from time to time," and lie with E.S. in her bed, holding her tight, "because she is special needs and needs to feel the pressure."  ACS Investigation Notes at 1; Defts. 56.1 Stmt. ¶ 23; *see* Shmuel Stollman Dep. Tr. at 27:11-28:2 (testifying that he sometimes kisses E.S. on the lips, holds her body so she can feel the pressure of his body, and sleeps with her in his bed).  According to Ortiz's investigation notes, Mr. Stollman stated in his interview that "he understands that [E.S.] is getting older an[d] it may not be right for her to be in the bed with him, and he will begin to teach her but right now [E.S.] does well when she is held and feels that pressure."  ACS Investigation Notes at 1.  L.S. shared that E.S. often does not sleep through the night and instead goes to her father's bed, and that L.S. sees them together in his father's bed in the mornings.  Defts. 56.1 Stmt. ¶ 23; ACS Investigation Notes at 8.  Ms. Stollman stated that E.S. had been coming home from school crying but maintained that she had no concerns regarding the appropriateness of E.S. and her father's interactions.  Defts. 56.1 Stmt. ¶ 23; ACS Investigation Notes at 4.

Recognizing that she could not interview E.S., Ortiz studied E.S.'s behavior instead. Ortiz Dep. Tr. at 29:8-11 ("Well, she's nonverbal, so most of your interview would be on her behavior: Is she hitting Mom? Is she hitting Dad? Is she hitting her sibling? Is she crying? Is she screaming?"). Ortiz reported that she

> observed E.S. take her father by the hand, lead him to her bed and tap on her pillow. It appeared that it was her method of signaling to the father to lay on the pillow. E.S. laid on her bed in a fetal position next to her father. Father placed his hand around E.S. and caressed her by "running his fingertip from the top of her back to her lower back and her right arm." E.S. placed her hand over father's face as he would face her and "signal with her two fingers to kiss her on the lips." E.S. also kissed her father on the neck and beard. She appeared relaxed and continuously said "shhhh" to her father's ears.

Defts. 56.1 Stmt. ¶ 23; *see* ACS Investigation Notes at 7.

With Plaintiffs' assistance, Ortiz also checked E.S.'s body for marks, bruises, and diaper rash. Before she inspected E.S.'s body, Ortiz asked Ms. Stollman if she could "just take a look for any marks or bruises." Elisa Stollman Dep. Tr. at 49:3-5. Ms. Stollman replied, "Okay." *Id.* at 49:7. When Ortiz informed Mr. Stollman that she needed to check E.S.'s body, Mr. Stollman "agree[d]" to the inspection and raised E.S.'s dress up above her breasts, allowing Ortiz to examine the "front and back" of E.S.'s body by circling her. Shmuel Stollman Dep. Tr. at 41:7-23, 57:6-11; Ortiz Dep. Tr. at 127:9-16. Ortiz also asked Ms. Stollman to take E.S.'s diaper off, again explaining that she was "[c]hecking for marks and bruises, that's what we have to do." Elisa Stollman Dep. Tr. at 52:2-7. Ortiz did not ask to see E.S.'s private areas. *Id.* at 52:8-9. Rather, after Ms. Stollman removed E.S.'s diaper, Ortiz "just looked at [E.S.]'s foot up and down a little and that's it." *Id.* at 83:4-10.

At the end of her visit, Ortiz consulted her supervisors, Lakeasha Williams and Kai Hayes. Ortiz Dep. Tr. at 129:4-130:17. Based on her review of the SCR intake report and Ortiz's observations, Williams had concerns of "[p]otential sex abuse." Dkt. 150-8 ("Williams Dep. Tr.")

8

at 51:17-20. Hayes believed that "there was concern around grooming, placing the child at further

risk for sexual abuse." Dkt. 150-10 ("Hayes Dep. Tr.") at 211:16-22.[2] After this call, Ortiz

informed Plaintiffs that ACS had decided to separate Mr. Stollman from E.S. until Monday, when

a Child Safety Conference could be held. Defs. 56.1 Stmt. ¶¶ 29-30. Mr. Stollman agreed to

leave the residence for the weekend and stay with his in-laws, and E.S. remained in her home in

the care and custody of her mother. *See* Ortiz Dep. Tr. at 103:8-104:9; Shmuel Stollman Dep. Tr.

at 57:17-25; Elisa Stollman Dep. Tr. at 37:12-25, 38:8-24. Based on this initial investigation,

Ortiz's team had determined that

> the parents appear to be unaware of the father's inappropriate relationship with E.S.,
> specifically the bathing and co sleeping; the father has access to E.S. and may be
> sexually abusing her; and E.S. is highly vulnerable because she is severely autistic
> and non-verbal and is unable to disclose what may be occurring.

Defs. 56.1 Stmt. ¶ 28; *see* ACS Investigation Notes at 2, 5; *see also* Ortiz Dep. Tr. at 100:9-23.

On the morning of Monday, October 30, 2017, Ortiz spoke with the school employee who

had called SCR regarding the suspected maltreatment of E.S. ACS Investigation Notes at 12-13.

The source conveyed that E.S. is autistic, is mainly non-verbal, and communicates on an iPad. *Id.*

The source further explained that E.S. had clicked "man, finger butt, [k]iss man and sick man" on

her iPad on October 19, 2017, and indicated a similar statement on her iPad again on October 27,

---

[2] In her deposition, Hayes explained her understanding of "grooming" as:

> behavior, or a behavior or situation that an abuser or, for lack of a better word, . . .
> someone who is going to have sex with a child, or a victim, they tend to normalize
> certain behaviors first before beginning the act of having sex, so that when they
> actually have sex with the child, it's a transition, that the child doesn't see it as
> abnormal in their rapport.

Hayes Dep. Tr. at 41:15-25.

2017.  *Id.* at 13.  The source stated that this behavior was alarming, concerning, and uncharacteristic of E.S.  *Id.*[3]

Later that day, Ortiz conducted E.S.'s Child Safety Conference, which Plaintiffs, E.S.'s maternal grandparents, Aviva Feldman (a representative of an agency providing home care for E.S. at the time), and ACS's children and family services specialists attended.  Defts. 56.1 Stmt. ¶ 32.  At the conference, Feldman, who had at that time known the family for ten years, expressed her strong disagreement with the sexual abuse allegations.  Pls. Counter 56.1 Stmt. ¶ 427.  Nevertheless, based on the information collected from E.S.'s school, the home visit, and the discussions during the Child Safety Conference, ACS implemented an intervention plan, which included filing a Petition seeking an Order to exclude Mr. Stollman from the residence, scheduling a forensic evaluation of E.S., and providing education and supportive services for Mr. and Ms. Stollman.  Defts. 56.1 Stmt. ¶ 34.

ACS thus filed an Abuse Case Petition on E.S.'s behalf (listing Mr. Stollman as the respondent), pursuant to Article 10 of the New York Family Court Act.  Defts. 56.1 Stmt. ¶ 35.  In that Petition, ACS alleged "[u]pon information and belief" that "[E.S.] is an abused child," based on observations contained in an addendum detailing the findings of Ortiz's investigation—which included Ortiz's conversation with the SCR Report source regarding the combination of words (*i.e.*, "man, finger butt," "kiss man," and "sick man") that E.S. had selected on her iPad; Ms. Stollman's report that E.S. had been getting off the bus from school "crying hysterically" since "[o]n or about October 23, 2017"; Ortiz's observations of E.S.'s interaction with Mr. Stollman

---

[3] Plaintiffs urge that the source's statements constitute "inadmissible hearsay."  Pls. Counter 56.1 Stmt.  ¶ 9.  Defendants are relying on these statements not to prove their truth but rather to show their effect on Ortiz (and the other ACS Defendants) to demonstrate the reasonableness of ACS's decision to file an Article 10 Petition.  Dkt. 135 ("Defts. SJ Br.") at 18-19.  Accordingly, these statements are not hearsay.  *See* Fed. R. Evid. 801(c)(2).

during the October 27, 2017 home visit; and Ortiz's discovery from the various interviews that Mr. Stollman bathes and co-sleeps with E.S.  *See* Dkt. 133-10 ("Article 10 Petition") at 2-7.  The Petition concluded that "the subject children are abused and/or neglected or at risk of becoming abused and/or neglected pursuant to Article Ten of the Family Court."  *Id.* at 7; *see* Defts. 56.1 Stmt. ¶ 38.  Thus, the Petition asked for an order finding E.S. "to be an abused and neglected child."  Article 10 Petition at 3; *see* Defts. 56.1 Stmt. ¶ 38.  ACS also alleged that L.S. was derivatively neglected.  Article 10 Petition at 7.  Ortiz attested to the accuracy of the Petition's contents.  *Id.* at 4.

On October 30, 2017, the same day the Petition was filed, Family Court proceedings commenced before the Honorable Alison M. Hamanjian.  Defts. 56.1 Stmt. ¶ 39.  At the hearing, ACS asked Judge Hamanjian to issue (1) a temporary order releasing the children to the custody of Ms. Stollman and (2) a "full stayaway order of protection on behalf of both subject children against Mr. Stollman, except for visits supervised at the agency, with agency discretion to extend to an approved source."  *See* Dkt. 149-3 ("Oct. 30, 2017 Fam. Ct. Hr'g Tr.") at 4-7.  Mr. Stollman, through counsel, stated that he was "not objecting to ACS's application, but he's reserving his rights for a [section 1028 hearing, presumably to seek his return to the home]."  *Id.* at 6.  Judge Hamanjian issued the requested orders and adjourned the case for a preliminary conference on November 29, 2017.  Dkt. 133-11 ("Judge Hamanjian Orders") at 3-5.

In the meantime, ACS continued its investigation.  On November 8, 2017, E.S. was interviewed at a child advocacy center.  ACS Investigation Notes at 19.  Immediately after Ms. Stollman left the interview room, E.S. used her iPad to write "sleep, finger man, slap, husband, man to love."  *Id.*  E.S. further appeared to indicate that "husband" was "daddy."  *Id.*  E.S. could not answer any questions about her body or whether she was or had been hurt.  *Id.*  Rather, she

continued to press "husband sleep" and "Chinese food." *Id.*  The interviewer concluded that she could not obtain enough information to determine what occurred. *Id.*  On November 17, 2017, ACS conducted a supervised visit with Mr. Stollman and E.S. *Id.*  During the visit, E.S. repeatedly made "shhh" and snoring noises, wrapped Mr. Stollman's arm around her, and pulled Mr. Stollman's face close to hers. *Id.* at 19-20.  During another supervised visit on November 21, 2017, E.S. once again repeatedly sought physical contact with Mr. Stollman, and the ACS worker advised Mr. Stollman to control E.S.'s impulses. *Id.* at 23.

On December 4, 2017, Judge Hamanjian commenced a hearing at Mr. Stollman's request pursuant to section 1028 of the New York Family Court Act.  Judge Hamanjian Orders at 12-13; ACS Investigation Notes at 25.  Over twelve non-consecutive days, both Mr. Stollman and ACS presented witnesses and submitted documentary evidence.  Judge Hamanjian Orders at 12.  Ortiz, Fuschetti, and O'Connor testified at the hearing.  Defs. 56.1 Stmt. ¶ 41.  Upon the hearing's conclusion on February 14, 2018, Judge Hamanjian found that "ACS failed to meet their burden of establishing imminent risk to the subject children . . . if the respondent father returns home."  Judge Hamanjian Orders at 12.  Having "weigh[ed] the harm of removal with the risk to the child [in] determin[ing] whether any orders exist that can mitigate the risk," Judge Hamanjian concluded that Mr. Stollman could be permitted to return home, provided that: (1) he not be left alone with E.S. under any circumstance; (2) he not bathe E.S. or sleep in the same bed as her under any circumstance; and (3) he abide by the terms of the temporary order of protection. *Id.* at 12.  Judge Hamanjian further ordered ACS to continue conducting weekly home visits. *Id.* at 14.

Earlier that month, ACS had begun transferring the case from its Child Protective Services Unit ("CPS") to its Family Services Unit ("FSU").  Defs. 56.1 Stmt. ¶ 62.  On February 20, 2018, a joint CPS-FSU home visit was conducted to further discuss the transfer. *Id.* ¶ 63.  During that

and subsequent visits in the following weeks, ACS caseworkers observed that both E.S. and L.S. were clean and well-groomed.  *Id.* ¶ 64.  In March 2018, psychology and disability consultant Connie Twerski summarized her observations from her first four sessions with Mr. Stollman.  *Id.* ¶ 66.  She found no evidence that Mr. Stollman had molested or sexually abused E.S. but recommended that Mr. Stollman take better care to "avoid the appearance of impropriety" "when it comes to his daughter's care as she is physically developed as a young woman." Dkt. 133-9 ("ACS Progress Notes") at 38.

ACS continued its home and school visits until July 17, 2018, when it withdrew its Article 10 Petition.  Defts. 56.1 Stmt. ¶ 67.  Following that withdrawal, Judge Hamanjian dismissed the proceeding without prejudice.  *Id.*

## B.   Procedural History

Plaintiffs initiated this civil rights action on October 26, 2020.   Dkt. 1 ("Compl.").  The Complaint purports to plead eight causes of action, which as discussed below, *see infra* III, are exceedingly difficult to decipher, lack citation to applicable statutory or constitutional provisions, and often are unclear as to which Defendants particular claims apply.  *See* Compl. ¶¶ 107-162.  In general, though, Plaintiffs bring this action under 42 U.S.C. § 1983 to allege violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as under New York law.  Plaintiffs name as Defendants DOE employees O'Connor, Fuschetti, Keren Ennette,[4] Assistant Principal Montanile, Principal Russell, and Wheelock (collectively, the "DOE

---

[4] The Complaint alleges that, during 2017 and 2018, Ennette was employed by DOE as a teacher and was assigned to PS 77K.  Compl. ¶ 12.

Defendants"); ACS employees Williams, Ortiz-Downes, Glenn Hyman,[5] and Hayes (collectively, the "ACS Defendants"); and the City.

Defendants answered the Complaint on January 25, 2021.  Dkt. 18.  On January 4, 2023, following the close of discovery, Plaintiffs moved for partial summary judgment on their Fourth Amendment unlawful search claim.  Dkts. 125, 128 ("Pls. SJ Br."), 129-130.  On February 1, 2023, Defendants moved for summary judgment on all claims.  Dkts. 132-133, 135.  The parties filed their respective oppositions on April 3, 2023. Dkts. 144 ("Pls. SJ Opp."), 147.[6]  Plaintiffs replied on May 24, 2023, Dkt. 153, and Defendants replied on July 3, 2023, Dkt. 155.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477

---

[5] The Complaint alleges that, during 2017 and 2018, Hyman was employed by the City as a manager for ACS.  Compl. ¶ 8.

[6] In opposing Defendants' motion for summary judgment, Plaintiffs included errata sheets from Mr. and Ms. Stollman in connection with their depositions, *see* Dkts. 149-1, 149-2, as well as a declaration from Ms. Stollman, Dkt. 142.  Defendants urge the Court to reject the errata sheets, which are not dated or notarized, and the declaration "because they are impermissibly self-serving and seek to change the record."  Defts. SJ Reply at 4-7.  The Court declines to reject these materials in considering the parties' motions, although they have no material impact in the analysis that follows.

U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets it initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering 'what may reasonably be inferred' from witness testimony, the court should not accord the nonmoving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'"  *Taylor*, 2022 WL 744037, at *7 (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)).

Generally, on cross-motions for summary judgment, the Court evaluates each motion independently of the other, considering the facts in the light most favorable to the non-moving party.  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together."  *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

## III.  Discussion

Despite being drafted by counsel, Plaintiffs' eight-count Complaint fails to label their counts or cite any statutory or constitutional provisions underlying each count, making it difficult to discern what causes of action they are pursuing.  *See generally* Compl.; *see also* Pls. SJ Opp. at 4 n.2 (acknowledging their failure to "include a discrete cause of action for retaliation against DOE defendants").  Although the Court is not obligated to do so for a counseled party,[7] the Court nonetheless has liberally construed the Complaint's factual allegations, the relief sought, and Plaintiffs' subsequent submissions, and presumes that causes of action fall under the following categories.

To start, the Court presumes that the federal claims are all brought pursuant to pursuant to 42 U.S.C. § 1983, which provides, as relevant here:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  First, although not actually pleaded under any of their eight causes of action, Plaintiffs appears to bring a First Amendment retaliation claim against the DOE Defendants. Compl. ¶¶ 1, 51; *see* Pls. SJ Opp. at 4-9.  *But see* Compl. ¶¶ 107-162 (not mentioning "retaliation" once in the eight causes of action and only mentioning the First Amendment in Paragraph 118's general allegation that the City's "policies and/or practices constituted an unlawful interference with plaintiffs' liberty interests in the care and custody of their children and their right of intimate

---

[7] *See, e.g.*, *Abe v. New York Univ.*, No. 14 Civ. 9323 (RJS), 2016 WL 1275661, at *5 n.5 (S.D.N.Y. Mar. 30, 2016) ("[T]he Court has no obligation to liberally construe a counseled plaintiff's complaint.").

association with each other and with their children, in violation of the First and Fourteenth Amendments"). Plaintiffs also bring certain claims against only the ACS Defendants. They allege that the ACS Defendants committed procedural due process and substantive due process violations under the Fourteenth Amendment through their initiation of child removal proceedings and conducted an unconstitutional search of E.S. in violation of the Fourth Amendment. Compl. ¶¶ 124-128, 130-132, 147-149, 152; *see* Pls. SJ. Opp. at 9-16. Plaintiffs additionally appear to allege that both the DOE Defendants and the ACS Defendants maliciously and wrongfully prosecuted Mr. Stollman in violation of the Fourth Amendment, committed additional procedural due process violations under the Fourteenth Amendment, and violated Mr. Stollman's right to a fair trial under the Fourteenth Amendment. Compl. ¶¶ 114-119, 130-137, 140-141, 143-144, 154-155; *see* Pls. SJ Opp. at 17-26. Throughout the Complaint, Plaintiffs assert various municipal liability claims against the City. Compl. ¶¶ 108-113, 121-123, 130, 138-139, 150-151; *see* Pls. SJ Opp. at 26-31. Finally, Plaintiffs bring various corresponding claims under New York law as well as a violation of a general duty to act with reasonable care. Compl. ¶¶ 157-158, 160-162. Below, the Court addresses these claims in the various categories they appear to fall under.

## A.   Federal Claims

### 1.  First Amendment Retaliation Claim Against the DOE Defendants

Plaintiffs contend that the DOE Defendants reported the suspected maltreatment of E.S. to retaliate against Ms. Stollman for complaining about the school's supervision of E.S. To state a First Amendment retaliation claim, Plaintiffs must establish that: (1) their speech or conduct was protected by the First Amendment; (2) the DOE Defendants took an adverse action against them; and (3) there was a causal connection between that adverse action and the protected speech. *See Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010). Defendants do not contest that Ms. Stollman's complaints about PS 77K were protected by the First Amendment. Nor do they appear to contest

that there was a causal connection between Ms. Stollman's complaints and the DOE Defendants' decision to call SCR. Ms. Stollman's report that E.S. had been coming home from school crying was, of course, one of the reasons the DOE Defendants decided to call SCR. *See* SCR Report at 4. Rather, Defendants urge that because the DOE Defendants reasonably suspected child abuse or neglect, their SCR Report was not, as a matter of law, a retaliatory "adverse action." Defts. SJ Reply at 8-10. The Court agrees.

An adverse action is any "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). This objective standard is necessarily context-specific, and when applying the standard "in light of the special characteristics of the school environment," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the Court must take into account the state's interest in encouraging teachers to protect their students. *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011). In New York, that interest is so powerful that school officials are immune from civil and criminal liability when they report suspected abuse in good faith, and, conversely, face criminal and civil liability when they willfully fail to do so. N.Y. Soc. Servs. Law § 413(1)(a) (requiring teachers and school administrators to report suspected child abuse); *id.* § 419 (providing immunity for good faith reporting). Because of the "unusual deference" owed to such mandated reporters, First Amendment retaliation claims premised on a school official's report of suspected child abuse must meet "a more demanding standard." *Maco v. Baldwin Union Free Sch. Dist.*, 726 F. App'x 37, 39, n.1 (2d Cir. 2018); *see also Cox*, 654 F.3d at 274. Indeed, where the school official has "a sufficient basis" from which to suspect potential abuse, absent a "clear showing of retaliatory or

18

punitive intent," the report of suspected child abuse, "is, as a matter of law, not retaliatory." *Maco*, 726 F. App'x at 39 (internal citations omitted).

Here, the DOE Defendants plainly had a "sufficient basis" for the suspected maltreatment or abuse of E.S.  It is undisputed that Fuschetti had been made aware of concerns about E.S.'s hygiene, and that Ms. Stollman herself had also reported concerns about E.S.'s cleanliness.  *See* Fuschetti Dep. Tr. at 40:25-41:9; Wheelock Dep. Tr. at 99:23-104:8.  It also is undisputed that Wheelock observed E.S. select the words "butt, sleep, man, pillow, finger" on her iPad, that Wheelock considered this behavior uncharacteristic and concerning,[8] and that around the same time, Ms. Stollman reported to the DOE Defendants that E.S. had been arriving at home crying and upset.  Wheelock Dep. Tr. at 141:8-142:10; Elisa Stollman Dep. Tr. at 43:16-44:10. Considering the "unusual deference" owed to mandatory reporters, and especially given that E.S.'s inability to communicate made her particularly vulnerable and her aberrant behaviors particularly

---

[8] Plaintiffs contend that "Wheelock says that she . . . was not concerned about the words that ES had displayed" on the iPad." Pls. SJ Opp. at 3.  Plaintiffs' citations to Wheelock's deposition do not support this assertion.  To the contrary, Wheelock testified at her deposition:

Q:  Did what E.S. wrote concern you?

[Defendants' Attorney]:  Objection as to form.

A:  Yes, it did.

Q:  Why?

A:  I didn't know where it was coming from or what -- where she was getting all of these references for from and why.  I knew that her behavior had started changing.  And I just didn't know all of the details of what was going on to even make an assessment.

Wheelock Dep. Tr. at 131:5-17.  Wheelock merely testified that the *first time* E.S. used the word "butt" she "just though it was silly, and inappropriate, you know, just making a little fun," but she immediately explained that "later on in the year it was just excessive." *Id.* at 141:20-24.  Wheelock further explained that, in addition to using the word "butt" and "reference to sleeping with men . . . or man or kissing and . . . us[ing] the word hug sometimes," E.S.'s "behavior [was] changing" in a manner that Wheelock "found inappropriate." *Id.* at 142:3-10.

difficult to assess, the Court finds that the DOE Defendants had a sufficient basis for their report. *See Oglesby v. Eikszta*, 499 F. App'x 57, 60 (2d Cir. 2012) ("We owe defendants' decision to report reasonably suspected abuse and neglect unusual deference given their legal obligation to report suspected abuse and their potential liability for failing to do so." (internal quotation marks omitted)).

Moreover, Plaintiffs have not made a "clear showing of retaliatory or punitive intent." *Maco*, 726 F. App'x at 39. Plaintiffs urge that the DOE Defendants made deliberately false statements as to E.S.'s hygiene and iPad use in their suspected child abuse report, and they ask the Court to thus infer the DOE Defendants' retaliatory intent. Pls. SJ Opp. at 5-9. These arguments too fail.

Plaintiffs first insist that the DOE Defendants made knowingly false allegations about E.S.'s hygiene because Fuschetti "had no personal knowledge of E.S.'s hygiene," O'Connor had no concerns about E.S.'s hygiene, and staff members had not reported any hygiene issues in E.S.'s communication book for that time period. *Id.* at 5-6. But even if the hygiene-related statements in the SCR Report were ultimately false (a conclusion that this Court need not reach), such inaccuracies cannot give rise to an inference of retaliatory intent because Plaintiffs have pointed to no evidence in the record to suggest that the DOE Defendants knew, or had any reason even to suspect, that the information was untrue. *Cf. Maco*, 726 F. App'x at 39-40 (explaining that a factfinder cannot reasonably infer retaliatory motive from the defendant's inaccurate statement that the plaintiff failed to have her child's mental health evaluated when the plaintiff had, in fact, done so, because the information regarding the evaluation "was not communicated to the defendants"). On the contrary, Fuschetti testified that another staff member had relayed those hygiene concerns directly to her. Fuschetti Dep. Tr. at 40:19-41:9. Accordingly, and given that

the report to SCR in 2016 was based on similar observations and that Ms. Stollman herself had

also complained about E.S.'s cleanliness, the DOE Defendants reasonably relied on the staff

member's report when deciding to contact SCR.

Next, Plaintiffs contend that the DOE Defendants made knowingly false allegations in the

SCR Report as to E.S.'s iPad use.  They appear to blame the DOE Defendants for the SCR intake

report's exclusion of the entire set of words that E.S. had selected on her iPad:

> [The DOE Defendants] made an oral report, transcribed by the State Central
> Register, that ES had pressed only a few icons on her iPad.  In fact, as the 2221A
> form shows, she displayed 22 icons.  The complete string of words, if presented
> to the Register, would have undermined DOE Defendants' accusation, raising the
> inference that they had deliberately concealed material information (19 words) in
> their oral report.

Pls. SJ Opp. at 7 (internal record citations omitted).  Even assuming that this omission in the intake

report (which was prepared by the SCR employee who fielded the DOE Defendants' call, not by

the DOE Defendants) is attributable to the DOE Defendants, it does not amount to a materially

false allegation.  *Cf. Cox v. Warwick Valley Cent. Sch. Dist.*, No. 07 Civ. 10682 (JSG), 2010 WL

6501655, at *13 (S.D.N.Y. Aug. 16, 2010) (finding that a statement in a child services intake report

about the child including "homicidal" imagery in her writing was not materially false, given that

the child's writing did reference potential violence against others), *aff'd*, 654 F.3d 267 (2d. Cir.

2011).

Finally, Plaintiffs urge that Defendants "knew that ES was not making a 'statement' on her

iPad when she pressed the icons for man, finger, and butt," that E.S. "had frequently pressed those

and similar icons in the past," and that this "cover-up shows [D]efendants' retaliatory intent."  Pls.

SJ Opp. at 6-7.  But Plaintiffs distort the record, which establishes just the opposite.  Wheelock,

who personally observed E.S. select the concerning set of words, testified that E.S. "used the iPad

to express her needs and her wants."  Wheelock Dep. Tr. at 46:12-15.  In fact, Wheelock believed

that E.S. knew how to use the iPad better than even she did.  *Id.* at 46:16-22.  And contrary to Plaintiffs' unsupported assertion that E.S. had frequently selected similar words, Wheelock testified that E.S. began selecting the concerning words in October 2017.  *See, e.g.*, *id.* at 141:14-15 (Wheelock testifying that the first time E.S. select the icon for "butt" was in early October). Mr. Stollman himself testified that he and Ms. Stollman were "in shock" to learn that E.S. had typed those words because they had "never seen her do that on her iPad."  Shmuel Stollman Dep. Tr. at 44:7-14.

In sum, Plaintiffs have adduced no evidence that the DOE Defendants reported knowingly false allegations to SCR.  Given that the DOE Defendants had a sufficient basis to suspect potential abuse or neglect, the Court finds that the DOE Defendants' report was non-retaliatory as a matter of law and so grants summary judgment in favor of Defendants on Plaintiffs' retaliation claim.

## 2.   Unlawful Search Claim Against the ACS Defendants

Next, Plaintiffs argue that Ortiz violated E.S.'s Fourth Amendment rights when Ortiz physically examined her during the October 27, 2017 home visit.  Compl. ¶ 146.  They further allege that Ortiz "acted pursuant to the instruction" of the other ACS Defendants—Williams, Haynes, and Hyman—in conducting this allegedly unlawful search.  *Id.*

The Fourth Amendment's prohibition against "unreasonable" searches presents a "somewhat amorphous standard whose meaning varies with the context in which a search occurs and the circumstances of the search."  *N.G. v. Connecticut*, 382 F.3d 225, 230 (2d Cir. 2004). Indeed,

> the determination of the standard of reasonableness governing any specific class of searches requires balancing the need to search against the invasion which the search entails.  On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

*New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) (internal quotation marks omitted).

In the context of a child abuse investigation, "it is clear that a strip search of a child implicates the child's Fourth Amendment interests, at least when the search serves an investigative function." *Taylor v. Evans*, 72 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 604-05 (2d Cir. 1999) and *Schwimmer v. Kaladjian*, 164 F. 3d 619, 1998 WL 708818, at *2-3 (2d Cir. 1998)). And in the Second Circuit, these "examinations of [] children for evidence of abuse [may] not be undertaken without parental consent or judicial authorization." *N.G.*, 382 F.3d at 237 (citing *Tenenbaum*, 193 F.3d at 597-99 and *van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir. 1990)); *see also Roe v. Texas Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 403 (5th Cir. 2002) ("The Second Circuit has taken an intermediate position [between the more rigorous probable cause requirement and the lesser special needs test]: Even if social workers need not satisfy the probable cause and warrant requirement in all cases, they must obtain prior judicial approval when doing so would not threaten the child's well-being.").

As to consent, the question of the voluntariness requires "an examination of the totality of all the surrounding circumstances." *United States v. Ruiz-Estrella*, 481 F.2d 723, 727 (2d Cir. 1973) (internal quotation marks and brackets omitted). Even in the context of a criminal prosecution, the Supreme Court has "refused to adopt a rule requiring that the prosecution show, as an absolute prerequisite to a consent theory, that the suspect knew of his right to refuse the search." *Id.* Rather, "that absence of such knowledge is one factor to be considered on the issue of the voluntariness of a consent search." *Id.*

Plaintiffs urge that they did not know they could refuse the body inspection, and that their consent was, as a result, neither freely nor voluntarily given. Pls. SJ Br. at 8-9. As discussed, however, such ignorance is not dispositive—it is just one factor to be considered. *Ruiz-Estrella*,

23

481 F.2d at 727.  And, here, all the undisputed facts surrounding the search and Plaintiffs' consent thereto demonstrate that the circumstances were non-coercive and that the consent was given voluntarily.  Unlike in *Ruiz-Estrella*, where the court found consent was not voluntary, Defendants were not wearing a uniform and a badge, nor did they physically confine Plaintiffs in an enclosed space.  *See id.* at 728 (holding that the defendant's consent was not voluntary when the agent, attired in a uniform and badge, asked for the defendant's consent after he took the defendant from a boarding area, into a stairwell, and closed the door behind them).  There was no police involvement or forced entry.  Rather, the home visit commenced with Ortiz, a caseworker, knocking on Plaintiffs' door, introducing herself, stating the reason for her visit, and waiting to be let in by Plaintiffs.

Turning to the search itself, Ortiz clearly explained that the purpose of the search was to check for marks, bruises, and diaper rash, and asked for Plaintiffs' affirmative consent before she conducted the inspection.  *See* Elisa Stollman Dep. Tr. at 48:23-49:3; Schmuel Stollman Dep. Tr. at 41:5-42:2; Ortiz Dep. Tr. at 127:9-16; Defts. 56.1 Stmt. ¶ 26.  And both Plaintiffs acknowledged during their depositions that they provided that affirmative consent.  Mr. Stollman answered "Yes" to the question of whether he "agree[d] that the body check [of E.S.] should be conducted." Shmuel Stollman Dep. Tr. at 43:5-7.  Similarly, Ms. Stollman testified as follows:

> Q:    During the home visit in 2017, do you recall that Ms. Ortiz asked to inspect E.S.'s body?
>
> A:    Yes.
>
> Q:    What, if anything, did Ms. Ortiz say before inspecting E.S.'s body?
>
> A:    Can I just take a look for any marks or bruises.
>
> Q:    Who did she say that to?
>
> A:    Me.

Q:      What did you say?

A:      Okay.

Elisa Stollman Dep. Tr. at 48:23-49:7.

Further, the inspection itself was then conducted with Plaintiffs' assistance and at Plaintiffs' home.  *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 247 (1973) ("[C]onsent searches will normally occur on a person's own familiar territory.").  Ortiz's examination entailed only a visual inspection of E.S.'s body, with Ortiz looking for bruises and marks and not touching E.S.'s private areas.  *See* Elisa Stollman Dep. Tr. at 52:2-9, 83:7-21; Shmuel Stollman Dep. Tr. at 57:6-11; *see also* Defts. 56.1 Stmt. ¶ 27 ("Ms. Ortiz did not touch E.S.'s private areas.").  Ms. Stollman recalled that, while she was present, Ortiz did not ask to view E.S.'s private parts and primarily looked at E.S.'s foot.  *See* Elisa Stollman Dep. Tr. at 52:8-9, 83:7-21.  In addition, at one point while Ortiz was looking at E.S.'s foot, Ms. Stollman asked Ortiz was she was doing, to which Ortiz responded, "I have to look at marks and bruises.  It's my job."  Elisa Stollman Dep. Tr. at 83:15-21.

Under these facts, which are not in dispute, no reasonable juror could conclude that Plaintiffs' consent to the body inspection of E.S. was involuntary.  Accordingly, the Court denies Plaintiffs' partial motion for summary judgment and grants Defendants' motion for summary judgment on this claim.

### 3.  Procedural Due Process Claim Against the ACS Defendants

Plaintiffs further claim that the ACS Defendants' decision to separate Mr. Stollman from E.S. between Friday, October 27, 2017, and Monday, October 30, 2017, without a pre-deprivation

hearing violated his procedural due process guarantees.  Pls. SJ Opp. at 16-17.[9]  As an initial

matter, the instant case does not implicate the full procedural guarantees associated with the

removal of a child because, here, Shmuel Stollman offered to leave the home while E.S. remained

in her mother's custody and care.  Ortiz Dep. Tr. at 103:8-104:9; Shmuel Stollman Dep. Tr. at

57:17-25; Elisa Stollman Dep. Tr. at 37:12-25, 38:8-24; *see Gottlieb v. Cnty. of Orange*, 84 F.3d

511, 522 (2d Cir. 1996) ("While we do not suggest that there is no substantive deprivation where

the parent elects to leave the home in preference to having the child removed, that election has an

impact on what procedures are required of the governmental agency.").  The Court nonetheless

finds that the ACS Defendants afforded the procedural due process required in the context of a

child removal.

It is well established that the state may not remove a child from her parent's custody

without a hearing "at a meaningful time and in a meaningful manner," unless there is an objectively

reasonable basis for believing that a threat to the child's health or safety is imminent.  *Gottlieb*, 84

F.3d at 520 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Although the Second Circuit

"has not attempted to set forth exhaustively the types of factual circumstances that constitute

imminent danger justifying emergency removal," it has determined that "the peril of sexual abuse,

[and] the risk that children will be left bereft of care and supervision" suffice to justify an

emergency removal.  *Southerland*, 680 F.3d at 149 (internal quotation marks omitted).  Even in

those circumstances, however, "where deprivation of a protected interest is permitted without prior

---

[9] The ACS Defendants are not responsible for any allegedly wrongful separation after Monday, October 30, 2017, when Mr. Stollman consented to the temporary removal order before Judge Hamanjian. *Cf. Southerland v. City of New York*, 680 F.3d 127, 153 (2d Cir. 2012) ("[O]nce such court confirmation of the basis for removal is obtained any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." (internal quotation marks omitted)).

process, the constitutional requirements of notice and an opportunity are not eliminated, but merely postponed." *Duchesne v. Sugarman*, 566 F.2d 817, 826 (2d Cir. 1977) (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  Due process still "requires that the state procedures provide the parent an opportunity to be heard at a reasonably prompt time after the removal." *Gottlieb*, 84 F.3d at 520; *see also Kia P. v. McIntyre*, 235 F.3d 749, 760 (2d Cir. 2000) ("The rule in this Circuit is that under these circumstances the State has the duty to initiate a prompt post-deprivation hearing after the child has been removed from the custody of his or her parents." (internal quotation marks omitted)).

There is no dispute as to what information drove the ACS Defendants' decision to separate Mr. Stollman from E.S. the evening of October 27, 2017.  From the SCR intake report, Ortiz had learned that E.S. selected icons for the words "man, finger, butt," and "kiss man" on her iPad, and that this behavior was uncharacteristic and alarming to school officials who worked with E.S. daily.  SCR Report at 4.  She had also learned that E.S. was arriving home from school crying around the same time.  *Id.*  From her interviews with the Stollman family, Ortiz discovered that Mr. Stollman bathed E.S. late at night, although others in the household were available to bathe E.S., and that E.S. frequently slept with her father through the night.  ACS Investigation Notes at 1.  And, finally, Ortiz personally observed Mr. Stollman in bed with E.S. engaging in repeated touching, caressing, and kissing.  *Id.* at 7.  After she relayed her observations to her supervisors, her team determined that

> [Mr. Stollman] has access to E.S. and may be sexually abusing her; and E.S. is highly vulnerable because she is severely autistic and non-verbal and is unable to disclose what may be occurring.

Defts. 56.1 Stmt. ¶ 28; *see* Investigation Notes at 2.[10]

Considering the information available to them and the unique challenges arising from E.S.'s inability to communicate with them, the ACS Defendants' belief that E.S.'s safety was imminently at risk was eminently reasonable.  *Cf. Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 105 (2d Cir. 1999) (explaining that courts, in assessing reasonableness in the context of child abuse investigations, "must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between difficult alternatives often need to be made on the basis of limited or conflicting information" (internal quotation marks omitted)).  Moreover, in responding to this perceived emergency, the ACS Defendants worked with Plaintiffs, and with their input, agreed that Mr. Stollman would be separated from E.S. only until the following Monday (three days later), when they provided Mr. Stollman with a "prompt" post-deprivation hearing.  *See Cecere v. City of New York*, 967 F.2d 826, 830 (2d Cir. 1992) (finding that a four-day separation without a post-deprivation hearing was constitutionally permissible).

---

[10] Plaintiffs do not dispute these facts.  Instead, they argue that Defendants lacked an objectively reasonable basis for believing that E.S. was in imminent danger, because one of the ACS Defendants, Hayes, had hypothesized that Mr. Stollman was "grooming" E.S. for future sexual abuse.  Pls. SJ Opp. at 32-33.  In other words, Plaintiffs urge that because "grooming" behavior itself falls short of sexual abuse, the ACS Defendants could not reasonably find that E.S. was in imminent danger.  But as Hayes testified, "grooming," as she used the term, entails someone preparing a child for sexual relations by normalizing such behavior in the child's mind.  *See* Hayes Dep. Tr. at 41:15-25.  And even if such "grooming" were somehow not deemed to place a child in imminent danger, the ACS Defendants' determination that Mr. Stollman "may be sexually abusing [E.S.]" was reasonable under the circumstances, regardless of Hayes's subjective view of whether "grooming" was taking place.  *Cf. Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001) ("Because the test is an objective one, the officer's subjective beliefs about the [seizure] are irrelevant." (alteration in original) (internal quotation marks omitted)).  And, further, Second Circuit case law does not foreclose the conclusion that "risk of harms less grave than actual injury or sexual abuse" also constitute "danger."  *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003).

In these circumstances, the Court concludes that the ACS Defendants afforded Plaintiffs the requisite due process as a matter of law, and so grants summary judgment dismissing Plaintiffs' procedural due process claim.[11]

### 4. Substantive Due Process Claim Against the ACS Defendants

Plaintiffs' substantive due process claim, which seems premised on the ACS Defendants' decision to separate Mr. Stollman from E.S. over the weekend of October 27, 2017, also fails.

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland*, 680 F.3d at 151 (internal quotation marks omitted).  Accordingly, to prevail on a substantive due process claim, a plaintiff must show that the state action was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Anthony v. City of New York*, 339 F.3d 129, 143 (2d Cir. 2003) (quoting *Tenenbaum*, 193 F.3d at 600).

Parents undoubtedly have a constitutionally protected liberty interest "in the care, custody and management of their children." *Cox*, 654 F.3d at 275; *see Anthony*, 339 F.3d at 142 ("[F]amily members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." (internal quotation marks omitted)).  But this fundamental interest in familial integrity "does not automatically override the sometimes competing" government interest in protecting children particularly from harm caused by the parents themselves.  *Kia P.*, 235 F.3d at 758.  As the Second Circuit explained:

---

[11] To the extent Plaintiffs also pursue a procedural due process claim against the DOE Defendants, *see* Pls. SJ Opp. at 16-17 (arguing that "Defendants" violated Plaintiffs' due process rights), Plaintiffs provide no theory for why the DOE Defendants would face separately liability that is not addressed above.

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse.  If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.

*van Emrik*, 911 F.2d at 866.  In thus recognizing the need for "unusual deference in the abuse investigation context," this Circuit requires only that case workers have a "reasonable basis" for their findings of abuse or neglect.  *Wilkinson ex rel. Wilkinson*, 182 F.3d at 104.

Moreover, "state interference with a plaintiff's liberty interest must be severe before it rises to the level of a substantive constitutional violation."  *Southerland*, 680 F.3d at 152.  To that end, "[a]bsent truly extraordinary circumstances, a brief deprivation of custody is insufficient to state a substantive due process custody claim."  *Cox*, 654 F.3d at 275.  That is because the temporary placement of a child into government custody does "'not result in [the] parents' wholesale relinquishment of their right to rear their children.'"  *Nicholson*, 344 F.3d at 172 (alteration in original) (quoting *Joyner ex rel. Lowry v. Dumpson*, 712 F.2d 770, 778 (2d Cir. 1983)).

Here, ACS directed Mr. Stollman to separate from E.S. over the course of a single weekend, just until a Child Safety Conference could be held the following Monday.  That temporary separation—during which E.S. remained at home in the custody and care of her mother—does not as a matter of law give rise to a substantive due process violation, especially in light of the ACS Defendants' reasonable determination as to the imminent threat of harm facing E.S.  *See Cecere*, 967 F.2d at 830 (holding that the plaintiff's generalized due process claim failed because a "brief" four-day removal, executed "in the face of a reasonably perceived emergency," did not violate due process); *see also supra* III.A.3.

Plaintiffs also claim that the ACS Defendants' decision was "based upon material allegations that they knew or should have known to be false."  Pls. SJ Opp. at 13.  But Plaintiffs

do not specify which allegations they are claiming to be false, they do not explain why the ACS Defendants should have considered false any information relayed to them, and they cite no record evidence in support of their broad assertion. *See id.* at 12-13. Such "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Moreover, in its independent review of the record presented by the parties in their motions, the Court has found no evidence from which a juror could conclude that the ACS Defendants relied on information they either knew or should have known was false in making their decision to separate Mr. Stollman from E.S. *See also infra* fn. 12.

The Court thus grants summary judgment in favor of Defendants on Plaintiffs' substantive due process claim.

### 5. Malicious Prosecution Claim Against the ACS Defendants and the DOE Defendants

Next, Plaintiffs urge that the ACS Defendants and the DOE Defendants maliciously prosecuted Mr. Stollman in bringing the Article 10 Petition against him, although their theory for the liability of the DOE Defendants here is unclear. In any event, this claim fails as a matter of law as well given the undisputed facts.

To prevail on a section 1983 malicious prosecution claim, a plaintiff must: (1) show a violation of his Fourth Amendment rights, such as "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests," *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks omitted); and (2) establish the elements of malicious prosecution claim under state law. *See Manganiello v. City of New York*, 612 F.3d 149, 160-161 (2d Cir. 2010). Under New York law, those elements are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in

plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice

as a motivation for defendant's actions."  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 198 (2d

Cir. 2014).

Although Second Circuit case law does not categorically preclude a section 1983

malicious prosecution claim premised on a civil or administrative proceeding, the law in this

Circuit remains "unsettled as to whether child removal proceedings can give rise to a federal claim

for malicious prosecution of a parent."  *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir.

2015).  Given this lack of clarity, Defendants are entitled to qualified immunity on Plaintiffs'

malicious prosecution claim.  *See Dabah v. Franklin*, No. 22-845, 2023 WL 3577872, at *3-4 (2d

Cir. May 22, 2023) (holding that "the individual defendants were entitled to qualified immunity

on [the plaintiff's malicious prosecution] claim because [the Second Circuit] ha[s] never

recognized any such independent Fourth Amendment right of the parent" in the context of civil

child removal proceedings).

But even assuming *arguendo* Plaintiffs' section 1983 malicious prosecution claim to be

cognizable, it fails because Plaintiffs have not demonstrated the absence of probable cause.  In

New York, the existence of probable cause—described in the malicious prosecution context "as

such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff

guilty"—is a complete defense to a claim of malicious prosecution.  *Boyd v. City of New York*, 336

F.3d 72, 76 (2d Cir. 2003); *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  Here, the

same information justifying ACS's initial decision to separate Mr. Stollman from E.S.—namely,

the SCR Report describing the words E.S. had been selecting on her iPad, Ms. Stollman's report

that E.S. had been coming home crying, and Ortiz's direct observation of the interactions between

Mr. Stollman and E.S.—provided the ACS Defendants with probable cause to initiate the Family Court proceedings.

The Court thus grants summary judgment dismissing Plaintiffs' section 1983 malicious prosecution claim.

### 6. Right to Fair Trial Claim

While the Complaint appears to allege that both the ACS Defendants and the DOE Defendants violated Mr. Stollman's right to a fair trial, Plaintiffs' summary judgment briefing only advances a theory as to the ACS Defendants' liability. Regardless, this claim fails as well.

Plaintiffs argue that the ACS Defendants violated Mr. Stollman's right to a fair trial "by fabricating evidence and making false accusations that they used to prosecute him in Family Court and to separate him from his wife and children." Pls. SJ Opp. at 17. But this Circuit "has never recognized a constitutional right to be free from fabrication of evidence outside of the criminal context." *Rolon v. Henneman*, 443 F. Supp. 2d 532, 538 (S.D.N.Y. 2006), *aff'd*, 517 F.3d 140 (2d Cir. 2008); *see also Zappin v. Cooper*, No. 16 Civ. 5985 (KPF), 2018 WL 2305562, at *3 (S.D.N.Y. May 18, 2018) ("[A] denial of the right to a fair trial claim, as it is conceived of in the Second Circuit, is meant to redress unfairness in criminal proceedings that may go before a jury, and not civil bench trials."). Defendants therefore are, at a minimum, entitled to qualified immunity on this claim. *Cf. Baron v. Lissade*, No. 19 Civ. 6256 (RPK), 2021 WL 4407836, at *5 (E.D.N.Y. Sept. 27, 2021) ("Because there is no clearly established law on this circuit that fabrication of evidence during an administrative bench trial ever violates the Constitution, defendants are entitled to qualified immunity." (emphasis omitted)).

Setting aside Defendants' entitlement to qualified immunity, Plaintiffs' claim that the ACS Defendants fabricated information in the Article 10 Petition is meritless. According to Plaintiffs, the ACS Defendants declared without qualification in the Article 10 Petition that E.S. and L.S.

were abused children, that Mr. Stollman was responsible for their abuse, and that Mr. Stollman

had committed various sex crimes.   Pls. SJ Opp. at 18.   Plaintiffs contend that these were

deliberately false statements because, at the time ACS brought the petition, the ACS Defendants

did not know whether Mr. Stollman had abused E.S.  *Id.* at 17-19.  This misrepresents the contents

of the Petition, which expressly qualifies each of the challenged statements.  For instance, in the

Petition's caption, E.S. is described as "A Child Under Eighteen Years of Age *Alleged* to be

Abused by Sh[m]uel Stollman."  Article 10 Petition (emphasis added).  In addition, the Petition

clearly states that "(*Upon information and belief*), said child is an abused child."  *Id.* ¶ 5 (emphasis

added).  It further states that "(*Upon information and belief*) SH[M]UEL STOLLMAN, the Legal

Father of said child is the person who is responsible for the abuse and neglect of said child."  *Id.* ¶

6 (emphasis added).  These assertions, made upon information and belief, are neither contradicted

nor undermined by Ortiz's testimony, which Plaintiffs cite, *see* Pls. SJ Opp. at 17, that Ortiz and

the other ACS Defendants did not at the time "know what Mr. Stollman actually did."  Ortiz Dep.

Tr. at 176:9-10.  In fact, these assertions are entirely consistent with Ortiz's testimony and with

the very purpose of bringing such petitions: to commence proceedings to determine whether the

suspected abuse actually occurred.  *See* N.Y. Fam. Ct. Act § 1031.

Next, despite asserting that the ACS Defendants "ignored overwhelming evidence of Mr.

Stollman's innocence of the charges that they filed against him, and they knowingly or recklessly

submitted false evidence to the Family Court," Plaintiffs fail to specify what evidence the ACS

Defendants supposedly ignored.  Pls. SJ Opp. at 22.[12]   Once again, such bare assertions are

---

[12] Indeed, Plaintiffs lodge some variation of the accusation that the ACS Defendants ignored exculpatory information and manufactured false evidence against Mr. Stollman at multiple points in their briefing, *e.g.*, Pls. SJ Opp. at 13, 14-15, 22, without a modicum of credible support for this exceedingly serious allegation.

insufficient to overcome summary judgment.  *Kulak*, 88 F.3d at 71.  And whatever exculpatory evidence Plaintiffs may have had in mind, the ACS Defendants' failure to disclose it could not, in any event, give rise to a constitutional violation.  *See Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (finding no constitutional violation where "the heart of the complaint . . . is that [ACS] failed to adequately apprise the Family Court of exculpatory information").

The Court thus grants Defendants summary judgment on Plaintiffs' right-to-fair trial claim.

### 7.  Municipal Liability Claims Against the City

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court recognized that a municipality can be held liable under section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by" that body's officers.  *Id.* at 690; *see Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *24 (S.D.N.Y. Mar. 11, 2022) (recognizing that a municipality cannot be made liable under section 1983 under the doctrine of *respondeat superior*, but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury" (internal quotation marks omitted)).  A municipal body thus may not be held liable under § 1983 for unconstitutional acts of its employees, absent allegations that such acts are attributable to a municipal custom, policy, or practice.  *Monell*, 436 U.S. at 690-91; *accord Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is *caused by* a governmental custom, policy, or usage of the municipality." (citing *Monell*, 436 U.S. at 690-91) (emphasis added)).  Courts may not find *Monell* liability for constitutional injuries in the absence of individual liability, unless the plaintiff has complained of injuries attributable to actions of officials *other* than the

named individual defendants themselves. *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999).

Here, Plaintiffs have alleged injuries attributable solely to actions committed by the DOE Defendants and the ACS Defendants. Because the Court finds no liability for these individual Defendants, the Court grants Defendants' summary judgment motion on Plaintiffs' *Monell* claims as well. *Cf. Curley v. Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001) ("[W]e have recognized that a municipality cannot be liable for inadequate training or supervision when the officers involved in making the arrest did not violate the plaintiff's constitutional rights.").

**B.     State Law Claims**

Having dismissed all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction of Plaintiffs' state law claims. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Thus, while the Court grants summary judgment on and dismisses with prejudice the claims over which it has original jurisdiction, it dismisses Plaintiffs' state law claims without prejudice to filing in state court.

**IV.  Conclusion**

For the foregoing reasons, the Court denies Plaintiffs' motion for partial summary judgment and grants Defendants' motion for summary judgment.   The Court dismisses with prejudice all of Plaintiffs' federal claims and dismisses without prejudice all their state law claims, over which the Court declines to exercise supplemental jurisdiction.  The Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated: September 27, 2023
       New York, New York

JOHN P. CRONAN
United States District Judges